## GLEN L. WIGTON MOTOR CO. et al. v. PHILLIPS et al.

No. 23466. Opinion Filed April 25, 1933.

Clayton B. Pierce, Fred M. Mock, and Pierce, Follens & Rucker, for petitioners.

J. Berry King, Atty. Gen., and Robert D. Crowe, Asst. Atty. Gen., for respondents.

McNEILL, J. This is an original proceeding to review an order and award of the State Industrial Commission filed February 27, 1932, wherein the respondent Earl E. Phillips was awarded compensation for permanent partial loss of vision to his right eye.

Said respondent received an accidental personal injury to his right eye on April 26, 1924, while engaged as an automobile mechanic. One of the men in the shop tossed a pair of pliers, hitting him in the right eye, cutting the eyeball in three places. On May 6, 1924, the Maryland Casualty Company, insurance carrier, one of the petitioners herein, filed with the Commission, "report of initial payment of compensation" in the sum of $14.42. On January 29, 1925, the Commission filed its approval of settlement, as follows:

"Approval of settlement. It is ordered that final payment of $14.42 making an aggregate sum of $14.42 heretofore paid as compensation in this case be and the same is hereby approved on this Jan. 29, 1925.

"Attest:                F. L. Roblin, Chairman
"A. E. Bond,      H. C. Myers, Commissioner
"Secretary.    Edgar Fenton, Commissioner."

On September 29, 1931, there was filed with the Commission a motion to vacate and set aside award and reopen hearing to determine extent of disability. Said motion alleged a change of condition, and further alleged that the insurance carrier, through its agent, sought to have respondent sign a final release, but that respondent refused to sign said release for the reason that he had not been paid at the time all the compensation for the time he was unable to work; that as he had not fully recovered from said injury the extent of his disability could not be determined; and that respondent did not learn of the aforesaid order of January 29, 1925, until August 1, 1931.

A hearing was held on said motion on December 23, 1931, at Ponca City, Okla., and another hearing at Oklahoma City, on January 5, 1932. On February 27, 1932, the Commission made its award, finding that said respondent sustained an accidental personal injury arising out of and in the course of his employment, consisting of an injury to his right eye on April 6, 1924; that respondent had been paid the sum of $14.42 as compensation for temporary total disability; that by reason of said accidental injury, respondent sustained a permanent partial loss of vision to his right eye, estimated at 66 per cent., and awarded respondent compensation in the total sum of $951.72 at the rate of $14.42 per week for a period of 66 weeks.

Section 7294, C. O. S. 1921 [O. S. 1931, sec. 13360], makes the decision of the State Industrial Commission final as to all questions of fact, but where there is no competent evidence upon which to base such findings of fact, this court will disapprove and set aside the same.

In this case it was the contention of petitioners that there was no competent medical expert testimony to support the finding made by the Commission that the loss of vision of respondent's eye was due to the injury in question. In support of this contention, counsel state that the cause of respondent's loss of vision is astigmatism, and that the injury had nothing whatsoever to do with the loss of vision.

The record shows that respondent had been employed by the Glen L. Wigton Motor Company, petitioner, herein for about eight years; that immediately after the accident, on April 26, 1924, respondent was taken to the Ponca City hospital, and remained there for about four days under the treatment of Dr. Chas. L. Blank; that the insurance carrier later sent him to Oklahoma City for treatment, where he was treated by Dr. Fred B. Hicks, an eye, ear, nose and throat specialist, for about one week; that he returned

to Ponca City and continued under the care of Dr. Blank for about ten days.

Respondent testified that he returned to his work about six weeks after the accident; that he also received medical attention from Dr. Howard S. Brown, an eye, ear, nose and throat specialist; that at the time he returned to his work, he kept his eye bandaged for a period of about four weeks, and then commenced to wear colored glasses; that these were worn about three or four weeks; that his eyes have given him trouble since the accident; that he has continuous pain in his eyes and especially when he works under a light, it makes him sick and nervous; that he never wore glasses before or had any trouble with his eyes; that he has found it difficult to perform his work around the shop and cannot go without glasses; that at times he has been compelled to discontinue his work on account of his eyes hurting him; that the nature of his work at the garage was doing battery work.

The respondent was corroborated in his testimony by employees of petitioner in reference to respondent never complaining of his eyes prior to the injury, and that the respondent wore glasses since the injury to his eye. The attending physician's report filed May 9, 1924, by Dr. Blank, states that the respondent complained of blindness and pain due to the blow; that the treatment was: "Eye cleaned—all foreign particles removed—alropin cold packs—asperin"; that no previous sickness or injury contributed to his disability "except astigmatism"; that patient failed to return after 5-2, and I have had no further report from him." "His vision at that time was Ad 20/30 Os 20/24, very little inflammation remaining, but patient complained of occasional pain in eye." This report was dated 5-8-1924. The doctor was not called as a witness by either of the parties.

Dr. Brown, an eye specialist, testified on behalf of respondent, that he examined him in October, 1924, and at that time respondent had a 20/140 vision in the right eye, being a loss of 65.8 per cent. He examined him again in June, 1925, but made no test of his vision. On May 23, 1930, his right eye revealed a vision of 20/120. He examined him again on October 7, 1931, and found his vision in the right eye to be 20/140, the extent of disability in percentage being 65.8. Dr. Brown also testified as follows:

"Q. Doctor, assuming that on the 26th day of April, 1924, claimant was struck in the eye with a pair of pliers and that his eyeball cut in three places, and up to that time he never had any disability with his eyes, but since then he continues to have trouble and pain in his eyes, in your opinion, is that the result of the injury received and the disability you now find in his eyes, is that the result of the injury he gave you a history of? A. I didn't find any evidence of injury when I first examined him. Q. You didn't find any evidence of injury when you first examined him? A. No, sir, no scarring. Q. Assuming, Doctor, that he received such an injury, would the disability he now has be caused or attributed to that injury—that is would the injury attribute to his present condition? A. Yes, it might. Q. Doctor, a man with that much disability, 65.8 per cent. would have trouble with his eyes, wouldn't he? A. Yes, sir."

Dr. J. W. Shelton, of Oklahoma City, specialist in eye, ear, nose, and throat, testified on behalf of petitioner that he examined the respondent on January 5, 1932, and found a high degree of corneal astigmatism, 5 diapters in the left eye and 4½ in the right associated with myopia. He also testified that he found no evidence of injury to either eye; that the cornea was entirely clear; that his vision in his right eye was 20/200 minus, in the left eye 20/200; that he concluded that respondent suffered no injury to his eye as a result of his accident, and that the eye condition at the time of the hearing was due to high degree myoptic astigmatism. The doctor also testified as follows:

"By the Court: Q. Ordinarily, will a cut of the eyeball leave a scar? A. A cut on the cornea will always show a scar, but a cut on the conjunctiva would be pretty hard to tell. If it was a trifle cut, it might show the scar tissue afterwards and might not, because the tissue is replaced in the cornea by scar tissue which is opaque and the cornea is normally transparent, and most any kind of scar tissue will show up. Q. The same day after this accident the employer reported to this Commission that this fellow workman threw a pair of pliers upon the work bench just as the claimant turned around, and says his eyeball was cut in three places; thought serious; this was the right eye. Do you think they were mistaken about that right eyeball being cut? A. No, sir, that's possibly true, but I don't know the condition of his eye at the time, but I judge it's conjunctival astigmatism. Q. Now, the insurance carrier paid this man and stated the nature of the injury as right eyeball cut in 3 places, several days after the accident; do you think they could be mistaken about this man having his right eyeball cut in three places and have paid him compensation? A. No, but if I could have seen him right afterwards, I could have told

more about it. Q. You didn't see him until about three years? A. No, sir. Q. Could there be astigmatism from a traumatic injury? A. Yes, sir. Q. What would be the condition if the astigmatism was caused by the injury? A. Well, where they have astigmatism caused by trauma, you can usually find some character of abrasion. Q. What was the vision this man had in his right eye? A. He had 20/200 minus. Q. That's a loss for industrial vision? A. Yes, sir, I think this man would be classed as industrially blind. Q. In both eyes? A. Yes, sir. Q. What vision did you give him in the left eye? A. About the same, 20/200th. Q. It was correctable with glasses to what? A. With the glasses he is wearing, it was correctable down to about 20/40ths."

Dr. Hicks, for respondent, as follows:

"Q. Doctor, assuming that on May the second day he came to see you the first time, Doctor Blanks examined him and reported a vision in his right eye to be 20/30, and on August the 17th Doctor Brown reported a vision of the right eye to be 20/140, and again on October 7, 1931, found the vision to be 20/140, assuming, Doctor, that he received no other injuries to his eye, would you say, Doctor, that the injury might have contributed to the loss of vision? A. Well, that question could be answered in two ways; assuming that was the facts, you might say that the injury had something to do with it. But the fact that we could find no evidence of injury to the cornea that could affect his vision, it makes you more inclined to think that the doctor was mistaken when he gave him a 20/30th vision in 1924."

The record discloses that Dr. Brown finds that the loss of vision of right eye is 65.8, and that this loss of vision might be attributable to the injury. Dr. Shelton concludes that there could be astigmatism from a traumatic injury. Doctor Hicks testified that the loss of vision might be produced by the injury if the attending physician's report was correct. There is nothing in this record to indicate the attending physician's report was not correct.

Emphasis has been made in the brief of petitioners relative to the testimony of Dr. Brown that the injury received might have caused the resulting disability, and that such evidence is conjectural, speculative, and not sufficient upon which to base an award by the State Industrial Commission.

This court, in the case of Magnolia Petroleum Co. v. Snapp, 149 Okla. 51, 299 P. 137, in the third paragraph of the syllabus, said:

"Evidence that an employee's sight in one eye began to fail shortly after an injury to the other eye and that the condition might have resulted from the injury, is sufficient to support a finding by the State Industrial Commission that the injury did result therefrom."

In this connection, see, also, Indiana Power & Water Co. v. Miller (Ind.) 127 N. E. 837.

In the case of Jackson v. Harries, the Supreme Court of Utah, 236 P. 234, said:

"The objection is that they call for testimony which is immaterial and incompetent. The argument is made that the experts are called because they are supposed to be competent to express an opinion, having probative value, as to the real cause of the plaintiff's condition; and that, to support the charge that defendants are responsible for that condition, the expert opinion should be addressed to the conclusion as to whether or not defendants' acts were the cause thereof. If the expert could not say that, in his opinion, the acts complained of did or did not cause the injury, then his testimony was without value, being mere speculation and conjecture, and affording no basis for an award of damages.

"The following cases support this view: People's Gas, etc., Co. v. Porter, 102 Ill. App. 461; Elward v. Ill. Cent. Ry. Co., 161 Ill. App. 630; Lazarus v. New York City Ry. Co., 46 Misc. Rep. 473, 92 N. Y. S. 246; Carlile v. Bentley, 81 Neb. 715, 116 N. W. 772; Houston, etc., v. Fox (Tex. Civ. App.) 156 S. W. 922; Huba v. Schnectady Ry. Co., 85 App. Div. 199, 83 N. Y. S. 157.

But the overwhelming weight of authority is against appellants' position upon this point, and is in support of the rule that it is proper to put such questions in the form used in this case, so as to obtain the opinion of the expert witness as to whether or not the acts assumed could be or might be the cause of the condition described, and leaving it to the jury to say whether or not they were in fact the cause thereof. These cases, it seems to us, are supported by the better reason. A number of them are the following: Sachra v. Manilla, 120 Iowa, 567, 95 N. W. 198; Strever v. Woodard, 160 Iowa, 332, 141 N. W. 931, 46 L. R. A. (N. S.) 644; Castanie v. United Rys. Co., 249 Mo. 192, 155 S. W. 38, L. R. A. 1915A, 1056; Lutz v. Railway Co., 123 Mo. App. 499, 100 S. W. 46; Thomas v. Street Ry. Co., 125 Mo. App. 131, 101 S. W. 1121; Smith v. Kansas City, 125 Mo. App. 150, 101 S. W. 1118; Baehr v. Surety Co., 133 Mo. App. 541, 113 S. W. 689; Patterson v. Traction Co., 178 Mo. App. 250, 163 S. W. 955; Hutton v. Street R. Co., 166 Mo. App. 645, 150 S. W. 722; Railway Co. v. Foster, 226 Ill. 288, 80 N. E. 762" (Citing eighteen additional cases.)

See annotator's note, L. R. A. 1915A, p. 1070.

Jones, Commentaries on Evidence (2nd Ed.) vol. 3, sec. 1347, p. 2465, announced this rule:

"There are likewise a great number of cases wherein it appears that a medical expert was asked as to 'probable', 'possible', or 'likely', cause of death, or of a particular affliction, or as to what 'might' or 'could' have been the cause of such condition or of such death, and the practice of so framing the question is so common as not to warrant citation of authority."

In the case of Sundquist v. Madison Ry. Co. (Wis.) 221 N. W. 392, the Supreme Court of Wisconsin, in construing the question of whether a nervous ailment might have some connection between the accident and paralysis of the plaintiff, said:

"In order that his testimony may be admissible, it is not necessary, often not possible, for a physician to state positively that disability followed directly from a given injury. A jury's finding of reasonable certainty may be based on testimony that such a result may 'probably' follow or is 'likely,' 'liable', or 'apt' to follow the accidental injury."

The Commission is the trier of the facts under the Workmen's Compensation Law. It was its duty to determine from all the facts and circumstances, including the expert testimony, as to whether or not respondent was entitled to an award under the Workmen's Compensation Law.

We conclude that there is competent evidence in this record reasonably tending to support the award.

Award affirmed.

RILEY, C. J., CULLISON, V. C. J., and OSBORN, BAYLESS, and BUSBY, JJ., concur. SWINDALL, ANDREWS, and WELCH, JJ., absent.