# Provident Life & Accident Insurance Co. of Chattanooga, Tenn., et al. v. Diehlman.

(Decided Feb. 19, 1935.)

JOS. S. LAWTON and O'NEAL & O'NEAL for appellants.

BENJ. F. GARDNER and IRVING WALKER for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

This is an appeal from a judgment on a jury's verdict in favor of the beneficiary of an accident insurance policy. Lawrence Diehlman, now deceased, was the insured, and Mary Diehlman, the widow, the beneficiary. The policy was issued by the Provident Life & Accident Insurance Company of Chattanooga, Tenn., insuring the life of Lawrence Diehlman, ''against loss resulting from bodily injuries effected directly, exclusively and independently of all other causes through external, violent and accidental means, except when intentionally self-inflicted while sane or insane,'' etc.

The contentions of the insurance company are ''that a peremptory instruction should have been given for it upon the ground that there was a failure to show [1] that there was an accident, [2] that there was no competent medical or other testimonies sufficient to show that the alleged accident contended for by plaintiff was the direct, exclusive cause of death, [3] incompetent testimony that was highly prejudicial, [4] improper argument by counsel of plaintiff of a highly prejudicial nature, sufficient alone to warrant a reversal, and [5] the verdict is flagrantly against the evidence.''

We shall dispose of these grounds according to the record. To do so properly and fairly requires a review of the evidence. It substantially shows that Lawrence Diehlman, 58 years of age, about 6 o'clock on the morning of October 4, 1932, was seen by his daughter, going down the basement steps, leading from the yard to her home, to resume work in the basement to her home, in which he had previously been engaged, taking down a brick wall. The wall before he began to take it down.

was seven feet high, and at that time it had been taken down two feet. The steps to the basement were in sight of where his daughter was engaged in the kitchen. He was working immediately underneath the kitchen, and the daughter could hear the noise incident to his work. Shortly after he entered the basement, he appeared at the head of the basement steps. The daughter did not observe before his coming up the steps that he had stopped work. She heard him coughing and also his footsteps as he came out of the basement. She went to the door and spoke to him as he came out. He sat down on the steps, "holding himself, crouched over," and, on being asked by her what was the matter, he responded, "I am hurt, I fell." She stated that at that moment he seemed to be in pain, but he immediately arose, passed through a gate leading out of her back yard into the yard to his home. She remained in the kitchen about ten minutes, when her mother called her. She went to his home, where she found him in a bedroom. Her mother directed a doctor be called. She called Dr. C. G. Russman, who resided in that vicinity, and he immediately came and administered a hypodermic. On his arrival, Dr. Russman examined him. He was dead, but he administered a hypodermic, hoping there was a possibility of reviving him. It was Russman's opinion he was dead at the time. According to Russman, he was "cold with perspiration; his face was ashy; he had a very anxious expression on his face, showing a premonition of death." The only history of his ailment Russman obtained was that he "had a pain in his chest." At the time the members of the family imparted this information, they were "all crying and worried." Dr. Russman directed the coroner be called. Dr. Roy L. Carter, the coroner, was called, and came to the home of Diehlman and found him lying on a sofa or settee. He did not take off Diehlman's clothing. He examined his face and head, "did not observe any mark on the side of the temple; did not see any broken blood vessel or cut." The history as given him was Diehlman was taken "suddenly sick," came out of the basement, complained of pain in his chest, and "passed away very rapidly." The undertaker arrived at Diehlman's home about noon. He stated there was no mark or bruise of any kind on the head of the deceased, and that, if such mark suddenly appeared on

any part of his body, it appeared after death and after the body left his custody. Diehlman's clothing and underwear were wet, and the body was in profuse perspiration, and the condition of his underwear and clothing was due to the perspiration. A certificate filed with the bureau of vital statistics stated his death was due to heart disease, angina pectoris.

The deceased's daughter, who had observed him come out of the basement and who had followed him to his home, testified that, before the doctor and the coroner arrived, Diehlman's face was dirty, and her mother washed it, and, at the time she did so, they noticed a mark—bruise—in the temple and also on the chin. It was fresh; it was not on his face when he went into the basement. The bruise in the temple was "about an inch and a half." The daughter further testified that the coroner did not examine Diehlman's body. He merely opened his collar, "and this is all he did."

The widow of Diehlman claims she saw, before the undertaker came, the bruise in the temple and on the chin, on the right side of his face.

Mrs. Murray, a neighbor, also saw the bruises on the right side of his face. Her statement was that the bruise in the temple was "about an inch or an inch and a half," to which she called Mrs. Englert's attention. A son of Diehlman noticed the bruises on the side of his face; the size and location thereof as given by him were identical to those described by the other witnesses. He claims he saw them before the arrival of the coroner.

The witnesses described the clothing Diehlman was wearing at the time of his death and declared they were dirty and showed the presence of lime, mortar, dirt, and yellow clay, similar to that on the floor of the basement in which he was working.

Henry Freadreacea was connected with Diehlman in the removal of the wall, and had agreed to return about 7:30 or 8 o'clock on the morning on which the latter's death occurred. On his return to begin work in the basement, Freadreacea discovered the absence of Diehlman. He went to the latter's home and found him dead, lying on the bed. He testified that the wall from which Diehlman was removing the brick was about five feet high, and, in order for him to dislodge the brick,

it was necessary for him to stand "on a box or something." He could not stand on the ground and work on the five-foot wall. Diehlman used a chisel and a crowbar with which to knock the brick out of place. The son of Diehlman testified that he entered the basement where his father had been at work and found an old chair at the place at which his father was engaged when knocking brick out of the wall. A crowbar and a chisel and other tools were in the basement near the chair.

A number of witnesses who had known Diehlman many years, some of them had engaged in manual labor with him, others had visited his home and associated with him, testified that Diehlman was an active robust strong man, in good health, with no ailments.

It was the consentient opinion of Drs. Arnold, Frey, and Cox, expressed in response to hypothetical questions reflecting the evidence and embracing the facts proven by the testimony of the lay witnesses, that Diehlman's death resulted from a cerebral hemorrhage, proximately caused, or "superinduced, by a fall." The symptoms of angina pectoris as described by these physicians are "gasping for breath, excruciating pain in region of the heart and down the left arm and shoulder;" the pain accompanying it "is very severe"; "a choking sensation—a shutoff of the breath;" and as a general rule "the patient does not struggle"; and the symptoms accompanying an injury on the head sufficient to produce a cerebral hemorrhage, resulting in death are, "a dizziness," "an internal hemorrhage," and "death soon ensues."

The physicians who testified for the beneficiary excluded angina pectoris as the cause of the death of Diehlman. It was their opinion that profuse perspiration does not solely denote angina pectoris; such perspiration, they claim, is generally present when bodily pain is present.

Drs. Russman, Carter, the coroner, and the undertaker agree that angina pectoris was the proximate cause of the death of Diehlman, and that there was no connection between this disease and his alleged fall.

It is apparent the evidence of the parties present two theories of the cause of the death of Diehlman. That of the beneficiary is that he fell while removing

brick from a wall in the basement; the dirt on his face and clothing, the bruise on the right side of his face, indicated he had so fallen, and that in falling the right side of his face, in the temple and on the chin, was bruised; and the fall produced an injury which super-induced a cerebral hemorrhage resulting in his immediate death, independent of all other causes. That of the insurance company is, Diehlman did not fall, did not sustain an injury, and his death was due to angina pectoris. It offered no evidence tending to show there was no dirt on his face and clothing.

The insurance company most strenuously and earnestly contends that the statement of Diehlman to which his daughter testified, namely, "I am hurt, I fell," was incompetent and highly prejudicial. The statement attributed to him is corroborated by the appearance, action, and conduct of Diehlman as described by the daughter; also by the presence of dirt on the right side of his face, the bruises in the temple and on the chin, and the condition of his clothing. But such corroboration does not relieve us of the obligation of determining whether Diehlman's statement, "I am hurt, I fell," was and is a part of the res gestæ as this term is generally defined and used in such cases.

It is an accepted rule that res gestæ which is closely related to, but distinct from, that concerning subsequent statements, is admissible when it consists of spontaneous declarations by an injured person following so soon after sustaining an injury that no time or motive for fabrication could be presumed. The competency of such declarations has been the subject of much consideration by the courts. See Fid. & Cas. Co. v. Cooper, 137 Ky. 544, 126 S. W. 111, 114; Travelers' Ins. Co. v. Mosley, 8 Wall. 397, 408, 411, 19 L. Ed. 437; Petrie v. Cartwright, 114 Ky. 103, 70 S. W. 297, 24 Ky. Law Rep. 903, 59 L. R. A. 720, 102 Am. St. Rep. 274; L. & N. R. R. Co. v. Molloy's Adm'x, 122 Ky. 219, 91 S. W. 685, 28 Ky. Law Rep. 1113; I. C. R. R. Co. v. Houchins, 125 Ky. 483, 101 S. W. 924, 31 Ky. Law Rep. 93; Omberg v. U. S. Mut. Ass'n, 101 Ky. 303, 40 S. W. 909, 19 Ky. Law Rep. 462, 72 Am. St. Rep. 413; National Life & Acc. Ins. Co. v. Hedges, 233 Ky. 840, 27 S. W. (2d) 422.

The competency of a declaration of an injured person was reviewed by the Supreme Court of the United

States in Travelers' Ins. Co. v. Mosley, supra. The individual in that case went downstairs, and when he came back "was suffering," and stated he "had fallen down the stairs." The evidence was ruled competent. We have applied this rule in a number of cases. It is generally accepted.

In Fid. & Cas. Co. v. Cooper, the facts were: Cooper was a passenger train conductor, in good health. He fell into a turntable pit, sustaining bruises and cuts to his chin, hands, and chest. He made a statement to the first person he met after he climbed out of the pit, the exact time not being shown. In disposing of the objection to this testimony, we said:

> "The court properly admitted in evidence the statements of Cooper made to the first person who reached him just after he climbed out of the pit. His face and his hands were bleeding, and his statement then, as to how he had received the injuries a few seconds after the accident occurred, was properly admitted as part of the res gestæ."

In National Life & Acc. Ins. Co. v. Hedges, we reviewed a number of cases, wherein statements of injured persons were made under circumstances similar to that in which Diehlman made the statement to his daughter. The court in all of them ruled such statements were a part of the res gestæ and therefore properly admitted as evidence.

We do not see how the present case can be distinguished from those cases. It is our conclusion that the declaration of Diehlman to his daughter was competent and properly admitted.

It is insisted that, "even though his statement were competent, it does not prove that he had a fall or was hurt as a result of the accident." Considering his statement in connection with his action and conduct, the condition of his face and clothing, there is very little room to doubt that he had a fall or that he was hurt as a result thereof.

It is true it is indispensable that the beneficiary establish by competent and relevant evidence that the death of Diehlman was the proximate result of an injury, independent of all other causes, and that, unless.

the evidence shows his death was due solely to the injury, the company is not liable. Ætna. Life Ins. Co. v. Bethel, 140 Ky. 609, 131 S. W. 523.

The character of an injury and a full description thereof may be' proven by lay witnesses, and the testimony of an expert is not indispensable to a recovery on account thereof, by an insured or in case of his death by the beneficiary. When so proven, a peremptory instruction is improper. Pac. Mut. Life Ins. Co. v. Cash,. 224 Ky. 292, 6 S. W. (2d) 239; Phillips' Committee v. Ward's Adm'r, 241 Ky. 25, 43 S. W. (2d) 331.

The causal connection between an accident and a plaintiff's injury need not necessarily be established by expert testimony alone. Horn's Adm'r v. Prudential Ins. Co. of America, 252 Ky. 137, 65 S. W. (2d) 1017; McAuliffe v. Metcalfe (Mass.) 193 N. E. 581. Where the relation of cause and effect between two facts has to be proven, the testimony of an expert that such relation exists, or probably exists, is enough. Pac. Mut. Life Ins. Co. v. Cash, 224 Ky. 292, 6 S. W. (2d) 239; Phillips' Committee v. Ward's Adm'r, 241 Ky. 25, 43. S. W. (2d) 331; American Acc. Co. v. Fidler's Adm'x, 35 S. W. 905, 36 S. W. 528, 18 Ky. Law Rep. 161; De Filippo's Case, 284 Mass. 531, 188 N. E. 245. It is true that if the testimony of the expert is merely that such relation is possible, conceivable, or reasonable, without more, it leaves the issue trembling in the balance (Bahre v. Travelers' Protective Ass'n, 211 Ky. 435, 277 S. W. 467); but slight additional circumstances may tip the scales. According to these principles, the expert testimony to the effect that Diehlman's injury was the proximate cause of his death is sufficient when taken in connection with his statement made, eo instanti, on his arrival at the head of the steps, leading from the basement, the description of the bruises on the side of his face, the presence of dirt on his face and clothing, the "holding his head and crouching over," his immediate death, coupled with the fact his health had always been good before the injury. American Acc. Ins. Co. v. Fidler's Adm'x, 35 S. W. 905, 36 S. W. 528, 18 Ky. Law Rep. 161; Pac. Mut. Life Ins. Co. v. Cash, 224 Ky. 292, 6 S. W. (2d) 239; Phillips' Committee v. Ward's. Adm'r, 241 Ky. 25, 43 S. W. (2d) 331; De Filippo's Case, 284 Mass. 531, 188 N. E. 245; McAuliffe v. Metcalfe (Mass.) 193 N. E. 581.

No one can say with absolute assurance of accuracy that Diehlman's death did, or did not, result directly from his sustained injury independent of angina pectoris and exclusively of its effects, or the latter disease was not a condition or the cause of his death. It could only be determined as any other fact. L. & N. R. R. Co. v. Napier, 223 Ky. 417, 3 S. W. (2d) 1070, 64 A. L. R. 513.

It was exclusively the province of the jury to choose whether the theory of the beneficiary or of the insurance company was the correct one and satisfactorily established by the evidence.

The issue as to whether his death resulted from the fall, independently and exclusively of all other causes, was properly submitted to the jury.

Applying the established rule that a peremptory instruction is proper only when the facts proven and the inferences reasonably deducible therefrom fail to establish the case (Collett's Guardian v. Standard Oil Co., 186 Ky. 142, 216 S. W. 356), we unhesitatingly declare it is our opinion the evidence is sufficient to sustain the jury's verdict (Omberg v. U. S. Mut. Ass'n, 101 Ky. 303, 40 S. W. 909, 19 Ky. Law Rep. 462, 72 Am. St. Rep. 413).

Respecting the insistence that improper argument of counsel of the beneficiary is sufficient alone to warrant a reversal, it is our conclusion it is without merit. To sustain this insistence, the insurance company cites to us Madisonville, etc., R. Co. v. Allen, 152 Ky. 706, 154 S. W. 5; Gunterman v. Cleaver, 204 Ky. 62, 263 S. W. 683.

The statement of counsel in those cases was to the effect that the affidavit purporting to contain the testimony of the absent witness was merely the affidavit of the defendant, and the absent witness would not so testify if present. In the present case, counsel of the insurance company, in his argument to the jury, when referring to the affidavit setting forth the undertaker's testimony, which was read as his deposition in behalf of the insurance company, stated: "This record shows that they never subpoenaed the undertaker. They did not want him to get here." At this point, counsel of the beneficiary stated, "The record shows we did."

Following this colloquy, counsel of the insurance company commented on the testimony of the daughter of the deceased, relative to her going to the door and observing her father coming out of the basement. Counsel of the beneficiary, in his argument in response thereto, referred to the affidavit containing the testimony of the undertaker in these words:

> "They prepared an affidavit as to which the witness Frye, would testify to, a man whom we had supœnaed as a witness. * * * They tell you in the affidavit which was filed that there was no mark * * * They put this in the poor fellow's mouth who is not here, * * * Are you going to believe this sworn statement of this man, Frey, who is away from here, or are you going to believe this statement that is prepared by counsel and filed in this case in order to serve their purpose? * * * I agree that is his testimony if he was here, but I say he stated something untrue in this affidavit, or if he were here and testified to that, he would state something untrue in making that statement. Now, which statement are you going to take? There is the statement over his own signature, and there is the statement he would make if here. I say one or the other is untrue. We got Frey's statement at the outset in good faith, endeavoring to comply with the requirements of this insurance company in making up proofs as to the cause of this man's death."

It is proper to remark that the court had admonished the jury that the affidavit containing the purported testimony of the witness Frey was to be received and regarded by it, and given the same effect, as if he were present in person and testifying. Also the witness Frey, in a statement that had been furnished by the beneficiary to the insurance company as a part of the proof of the death of Diehlman, stated there was a visible sign of an injury, "mark on the side of his face." This statement appears to have been treated as evidence before the jury.

The statement of Frey, furnished to the company as a part of the proof of the death of Diehlman, it is apparent conflicted with the statement read as his deposition and also with the testimony of the beneficiary's

witnesses. We are not prepared to say that counsel of the beneficiary traveled outside of the record or made statements to the jury not authorized by the evidence, or that he suggested the undertaker would not testify, if present, as in the statement or affidavit read as his deposition. He was within his rights when discussing both the statement and testimony of Frey in connection with that of the witnesses of his client.

A careful review of the record and of the briefs of the parties convinces us the insurance company was accorded a fair and impartial trial; no incompetent evidence was admitted against it; no evidence offered by it was improperly excluded; and the instructions of the court are not criticized.

Wherefore the judgment is affirmed.