FAIRY WHITE (FUGATE) on behalf of herself as the widow and in behalf of the minor children of Gerald R. White, Deceased,

*Claimant and Respondent,*

vs.

MAVERICK PRODUCTION COMPANY, a Corporation,

*Employer and Appellant.*

(No. 2360; July 1st, 1947; 182 Pac. (2d) 818.)

453

For the Appellant, the case was submitted upon the brief of Goppert and Housel and J. D. Fitzstephens, all of Cody, Wyoming, and oral argument by Mr. Ernest J. Goppert and Mr. Fitzstephens.

For the Respondent, the cause was submitted upon the brief and oral argument of Mr. H. S. Harnsberger of Lander, Wyoming.

454

## OPINION

KIMBALL, Justice.

This is a workman's compensation case. The employer, Maverick Production Company, appeals from an award to the widow (since remarried) and three minor children of Gerald R. White, who died April 28, 1943, while driving a truck.

The case was tried in the district court without a jury. The judge found that the workman's death resulted from an injury, "a bruising and crushing of the

shoulders, chest and neck," sustained in an accident April 6, 1943. The only contention of the employer on the appeal is that there is no substantial evidence to support that finding.

The employer was engaged in the business of transporting oil by truck from a pipe line terminal to Riverton, Wyoming. White was employed as the driver of one of the trucks which was powered by a Diesel motor and pulled a tank trailer. While the truck was being driven by White, on April 6, 1943, the rear axle of the trailer broke. White and a fellow workman who was with him jacked up the rear end of the trailer and placed a 12" x 12" block under the broken axle. White was under the axle lying on his side when the jack tipped and the rear end of the trailer dropped until the axle struck the block. This caused the broken end of the axle to press upon the upper part of the body of White, inflicting the injury described in the finding of the district judge. White crawled from under the truck without assistance. He said "he had quite a lot of pain," and his companion who thought White "was hurt quite bad" took him at once to a doctor at Riverton, 40 miles from the scene of the accident. The doctor at Riverton, Dr. Kendall, an osteopathic physician, in his report pursuant to section 72-121 (d), C. S. 1945, described the injury as "crushing of upper dorsal area with bruising and straining of ligaments of chest and shoulder girdles." At the hearing in the district court, Dr. Kendall testified that his examination of White on April 6, disclosed "evidence of bruises on his shoulders and chest, such as a crushing blow to him." He found no "evidence of dislocation or fractures, but strain of muscular tissue and ligament tissue through the upper chest." The treatment was "hot packs, heat to relax the strain, bruises of the muscles".

On April 8, the doctor found the patient improved,

and discharged him from treatment. Thereafter, probably April 9 or 10, White returned to his job, and continued to work until his death on April 28.

The widow testified that White was 36 years of age at his death. He had never been sick before the injury of April 6. After the injury his side was bruised and discolored. He complained of pain in his chest and shoulders. There were no marks on his chest. She could tell he was suffering from the way he got around. He walked in a stoop, and could hardly straighten up. "He wasn't a person to say much, but you could tell by the way he got around it was hard for him to get around." "When he would sit down he couldn't raise up. He would always grab his back. It took him a little while to straighten up; that is the way he would get out of the truck." He never regained the condition of good health.

Another witness, who worked with White, and saw him "about every day" both before and after the accident of April 6, testified that before that accident White was in good health, active and able-bodied. Afterwards, "to get out of the truck he would complain about his back when he got out, he walked with a stoop, kind of stooped over. He complained to me several times about his shoulders and back still hurting him." The condition of suffering and complaints continued until near the time of White's death.

Another fellow workman testified that after the injury of April 6, White made "complaint two or three different times about his chest bothering him, that it was sore, hurting him."

At 9 o'clock on the night of April 28, 1943, White, alone, left Riverton on his usual run to the pipe line terminal, and about an hour later the truck was found sitting upright, in gear, with all its lights on, in the sage brush at the side of the road. White's dead body

was in the cab. There was no signs of violence. An autopsy was performed by Dr. Ashbaugh, the county physician, who pronounced the death due to coronary thrombosis. There was no testimony to contradict Dr. Ashbaugh as to the immediate cause of death, and the question in the case is whether or not there is any substantial evidence to support a finding that the injury suffered by the workman in the accident of April 6, twenty-two days previous to the death, was a predisposing or contributing cause of the thrombosis.

Two physicians testified as experts, Dr. Rogers for the claimants, Dr. Ashbaugh for the employer.

Dr. Rogers testified that in his practice he had had "somewhat frequent" occasion to observe and recognize cases of coronary thrombosis. By a hypothetical question, setting forth the injury of April 6, the previous good health of the injured workman, and his death on April 28, pronounced to have been a result of a coronary thrombosis, the doctor was asked if he "would have an opinion as to whether or not that death was the result of the injury received on April 6, 1943." His answer was, "Yes, I would have an opinion." The examination then continued:

"Q. What is that opinion, doctor? A. That is a question that cannot be answered 'yes' or 'no'.

"The Court: You are asked for your opinion.

"A. It is possible that the coronary thrombosis is attributable to the trauma, and the injury sustained on the man's chest.

"Q. Of course there are cases of coronary thrombosis which have occurred without any history of injury? A. That is right.
*　*　*　*　*

"Q. Coronary thrombosis is the occlusion of the coronary artery. Occlusion means closing or shutting off? A. Yes.

"Q. If a person dies of coronary thrombosis, the coronary artery is closed up; how is that caused? A. It

may be caused by an injury to that artery, the result of which is over a period of time; the elements of the blood in passing the injured site within the lumen of the artery will produce a clot; that clot finally builds up to such an extent as to completely fill the lumen of the artery or the injured artery to such an extent it goes into spasm, and the lumen of the artery will be decreased to such an extent that the blood passage will slow down, and in slowing down the blood will cause a disturbance."

Dr. Ashbaugh, as a witness for the employer, testified that he performed the autopsy, and "found in the anterior left coronary an occlusion, which would be a clot in that vessel," and was the "actual cause" of death. There was no evidence of carbon monoxide poisoning. The blood was normal. A person dying from cononary thrombosis, such as he found in this case, would have no prior warning. There were no marks, contusions or abrasions, "just a normal body." No broken ribs. The lungs were filled with clots. The brain was not examined. Dr. Ashbaugh's opinion that the injury of April 6 had no relation to the thrombosis that caused death, and his reasons for the opinion appear in the record as copied below:

"Q. Doctor, would there be any causal connection, or any connection between a bruise or a squeezed injury that might have occurred two or three weeks before, to this coronary thrombosis? A. No connection.

"Q. Doctor, can you explain why there wouldn't be. A. I can read you one little article which is very late, dated 1945, September.

"Q. I would like to have your own explanation. A. Yes, I could explain it to you very easily. Now, if for instance, a man had some injury, I don't care whether a broken leg, or run a pipe through him or crushed his chest or anything else, how could anybody have a coronary occlusion or thrombosis from that injury; that would be impossible.

"Q. Why? A. Because if you take the course of the blood from the right auricle to the right ventricle into the lumen valves, the pulmonary arteries carrying the blood to the lungs, and there this blood clot, if he had one in his arteries, would stop in the lungs, the only thing he would have would be a pulmonary infarct.

"Q. By that, it would mean the clot would be lodged in the lungs. A. No, the clot would stop in the lungs.

"Q. And remain there? A. And remain there, yes. Then it could go from the lungs to the pulmonary veins into the left auricle, into the metro valve, and then to the left auricle, out into the circulation, and get into the first branch of the artery. You have a pressure from 100 to 500 milometers there.

"Q. That is the reason you say the death could not have occurred as a result of that injury? A. Absolutely.

"Q. Is that your whole reason? A. No; I have plenty of proof.

\* \* \* \* \*

"Q. You were never in a case where there was coronary thrombosis that originated in the coronary artery itself? A. I think that is where they originate. Let's get down to the coronary artery. Now, the first thing you have to understand of coronary diseases, what is the cause of them. If you can find the cause, then you know what happens.

"Q. I am only interested in the clot you find in the coronary artery. You know where that clot originated? A. Well, suppose it originated in the coronary artery.

"Q. If there had been injury to the inside walls of the artery, it could have occurred? A. No, it don't occur by trauma.

"Q. The inside of the artery is of very fine texture? A. Wonderfully.

"Q. And the least injury to that would possibly cause this blood to stop and cause a clot? A. No, trauma doesn't cause coronary occlusion. It doesn't do that.

"Q. It doesn't? A. It is impossible.

"Q. An injury to the heart itself by stresses or striking couldn't produce a condition which would result in the formation of a clot building up in the coronary artery? A. No, it could not. If you would like me to read this, I will do it."

The employer concedes, of course, that the order of award cannot be disturbed on appeal if there is substantial evidence to support it. In this court, the beneficiaries under the award are entitled to have the evidence in support of their claim taken as true and given every favorable inference which fairly and reasonably may be drawn from it. Willis v. Willis, 48 Wyo. 403, 429, 49 P. 2d 670, 678; Standard Oil Co. v. Sullivan, 33 Wyo. 223, 237 P. 253.

The employer relies on cases holding that a party having the burden of proof cannot prevail if the factors necessary to support his claim are left to guess or conjecture. This principle if often invoked in proceedings under workmen's compensation laws where the cause of disability or death must be determined by an inference from facts observed and proved, and opinions of experts. See Standard Oil Co. v. Sullivan, supra; Carter Oil Co. v. Gibson, 34 Wyo. 53, 241 P. 219; Christensen v. Grant, 54 Wyo. 382, 92 P. 2d 563.

It is often difficult to decide whether a finding of fact is a legitimate inference or a mere conjecture. In Kerr or Landrum v. Ayr Steam Shipping Co. (1915) A. C. 217, 223, Lord Loreburn said: "I do not find it profitable to consider whether the arbiter's award proceeded on inference or on some kind of speculation which was described in argument by four words successively, namely, conjecture, probability, guess and surmise. I am not qualified to draw a precise line between the thoughts suggested by those several words. They seem to me to run into one another." In the same case, at page 233, Lord Shaw remarked that the dis-

tinction between an inference and a conjecture "is as broad as philosophy itself. It is that an inference rests on premises of fact and a conjecture does not." In a later case, Viscount Dunedin suggested that Lords Loreburn and Shaw might have agreed that "The question will always be whether the proved facts will reasonably support the conclusion which has rested on them." Fisher or Simpson v. London M. & S. Ry. Co. (1931) A. C. 351, 364. The "proved facts" that will reasonably support an inference would, of course, constitute "substantial evidence" under our decisions. See Standard Oil Co. v. Sullivan, supra.

In considering the sufficiency of the evidence to support a finding that has been reached by inference, reviewing courts often say that the finding will not be disturbed if the inference is one that might have been drawn by a reasonable man. Koprowski v. Megeath Coal Co., 48 Wyo. 334, 345, 46 P. 2d 61, 64; Kerr or Lendrum v. Ayr Steam Shipping Co., supra, at page 232. In Lavender v. Kurn, 327 U. S. 645, 653, it was said that whenever "the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."

In Northwest Utilities Co. v. Ashton, 51 Wyo. 168, 180-188, 65 P. 2d 235, 237-241, after a careful consideration of our previous decisions bearing on the question of the reasonableness of inferences, we definitely refused to follow cases holding that in a civil action the evidence to justify an inference in favor of the party having the burden of proof must be sufficient to exclude any other inference that could fairly and reasonably be

drawn therefrom. We held that where the evidence justified either of two reasonable inferences, one favorable to the party having the burden of proof and the other favorable to his opponent, the trier of the facts should be allowed to determine which, if either, of the two inferences is more reasonable or probable, and make his finding accordingly. If the finding is in favor of the party having the burden of proof, this court on appeal will not hold that it was made by guess or conjecture, unless we can say, as a matter of law, that the inference in favor of the other party was more, or at least equally, probable.

Carter Oil Co. v. Gibson, supra, was a workman's compensation case in which, as in the present case, the employer relied on the rule that a fact necessary to support an award must not be left to guess or conjecture. We recognized the rule, and said that its meaning was indicated by a quoted excerpt from the opinion in Sponatski's Case, 220 Mass. 526, 108 N. E. 466, L. R. A. 1916 A, 333. The opinion in the Massachusetts case was by Chief Justice Rugg who, in explaining the rule, concluded with this caution: "Of course this does not mean, as was said by Lord Loreburn in Marshall v. The Wild Rose, (1910) A. C. 486, 3 B. W. C. C. 514, 'that he (the claimant) must demonstrate his case. It only means, if there is no evidence in his favor upon which a reasonable man can act, he will fail.' If the evidence, though slight, is yet sufficient to make a reasonable man conclude in his favor on the vital points, then his case is proved. But the rational mind must not be left in such uncertainty that these essential elements are not removed from the realm of fancy."

It seems to be well settled that a finding of causal relation between an accidental injury and the subsequent disability or death of the person injured will be treated as a guess or conjecture if it is based solely on the testi-

mony of medical experts, who are merely willing to say that in their opinion the injury might or could have caused, or possibly did cause, the disability or death. See note, 135 A. L. R. 517, collecting the cases.

These cases are authority in support of the employer's argument that Dr. Roger's testimony, by itself, is not sufficient to justify the inference of causal relation between the injury and the death. But Dr. Roger's opinion cannot be rejected as having no value. See note, supra, 135 A. L. R. at page 532. It was important on the question of the capacity or tendency of the injury to operate as a cause of death. An opinion that a causal relation is scientifically possible is helpful in determining what reasonable inference should be drawn from the facts. Langenfelder v. Thompson, 179 Md. 502, 20 A. 2d 491, 136 A. L. R. 960; Scanlon vs. Kansas City, 336 Mo. 1058, 1066, 81 S. W. 2d 939; Glen L. Wigton Motor Co. v. Phillips 163 Okla. 160, 21 P. 2d 751. In De Filippo's Case, 284 Mass. 531, 188 N. E. 245, the court said that, "Where the relation of cause and effect between two facts has to be proved, * * * the testimony of an expert that such relation is possible, conceivable or reasonable, without more, leaves the issue trembling in the balance. (Citing cases) Slight additional circumstances, however, may tip the scale." This language is repeated in Provident L. & A. Ins. Co. v. Diehlman, 259 Ky. 320, 82 S. W. 2nd, 350.

The Connecticut court has remarked that the opinion of a medical expert that a disease might have resulted from the employment "may be invaluable as an expression of a cautious opinion, in corroboration of other testimony." Madore v. New Departure Mfg. Co. 104 Conn. 709, 714, 134 Atl. 259. See, also, Garrnon v. S. S. Kresge Co. 114 Conn. 36, 157 Atl. 541.

In Christensen v. Grant, 54 Wyo. 382, 92 P. 2d 563, it was contended that the finding of causal connection

between an accident and an attack of appendicitis was based on guess or conjecture. The accidental injury to the workman was a strain and fall which did not cause any cuts, visible bruises or discolorations, but was followed by cramps and pain in the region of the stomach. On the evening of the day of the injury, the workman's ailment was diagnosed as appendicitis, and on the following day he submitted to an operation for removal of his appendix which was "moderately inflamed." The surgeon who performed the operation testified that "it would be possible" for the strain and fall "to cause the condition which finally resulted in the removal of the appendix;" he could not say that the injury "was the sole cause of the appendicitis—nobody can say that—but it is listed as a possible predisposing cause;" that if the workman received a sudden wrench and strain, whereby he was thrown to the ground, "the rupture of certain blood vessels internally could have caused this condition of the appendix." The workman's attending physician testified that the strain and fall "may have caused" the appendicitis. Although the opinions of the medical experts were only that the accidental injury might or could have caused, or possibly did cause, the appendicitis, we held that upon the entire evidence the finding of causal connection could not be rejected as a guess or conjecture.

Under the evidence in the case at bar there is no reason to doubt that the immediate cause of the workman's death was a coronary occlusion, as found by Dr. Ashbaugh at the autopsy, and as assumed by Dr. Rogers when he gave his opinion which was, in effect, that the injury of April 6 was a possible predisposing or contributing cause. Dr. Roger's reason for his opinion was that an injury to the artery might cause a clot to form and build up at the site of the injury. He was speaking of a clot that would remain at the place of its formation, and we do not think the trial court was

bound to accept the contrary opinion of Dr. Ashbaugh which evidently was based on the assumption that a clot formed as the result of a wound would never be stationary.

Dr. Ashbaugh's testimony does not show that at the autopsy he observed any condition of the arteries, blood or of the clot itself, to explain the cause of the formation of the clot. His testimony that the injury of April 6 had no connection with the death, was apparently based largely upon the opinions of medical authorities who believe that coronary occlusion never results from trauma. That may mean only that trauma does not hasten the occlusion or closing of the artery, the final thing that results in immediate collapse or death. Such an opinion, if accepted, would not tend to show what caused the blood to clot. Dr. Rogers suggested a possible cause, and no other cause is suggested in the evidence. See Barry v. Miller, 104 Conn. 362, 133 Atl. 37. Although the workman's body was examined at the autopsy by the physician who testified as a witness for the employer, there is no claim that the workman was afflicted with any disease that could have caused the obstruction in the artery.

We think the evidence of the workman's injury on April 6, his previous good health, and his subsequent physical condition, together with the opinion of Dr. Rogers, was sufficient to justify the trial judge in inferring that the injury was a predisposing or contributing cause of the death on April 22.

*The order of award will be affirmed.*

RINER, Ch. J. ,and BLUME, J., concur.