In the Matter of Injury to Elmer J. HAYNIE.

AMAX COAL COMPANY, Appellant (Defendant-Employer below),

v.

Elmer J. HAYNIE, Appellee (Plaintiff-Employee below).

No. 5027.

Supreme Court of Wyoming.

March 14, 1979.

David G. Lewis of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellant.

* At the time of oral argument, Guthrie, J., was Chief Justice. He retired from the court on December 31, 1978. By order of the court, entered on January 1, 1979, he has been retained in active judicial service pursuant to § 5, Art. 5, Wyoming Constitution, and § 5–1–106(f), W.S.1977, and has continued to participate in the decision and opinion of the court in this case.

1. It is our conclusion that in this instance the burden of proof is governed specifically by the provisions of § 27–361(a), W.S.1957, as amended, now § 27–12–603(a), W.S.1977, which provides as follows:

John M. Daly of Daly, Maycock & Anderson, Gillette, for appellee.

Before RAPER, C. J., McCLINTOCK, THOMAS, and ROSE, JJ., and GUTHRIE, J., Retired.*

THOMAS, Justice.

This case involves the application of the Worker's Compensation Act (§ 27–310, W.S. 1957, as amended, et seq., now § 27–12–101, W.S.1977, et seq.) to an occlusion of an internal carotid artery. The occlusion became manifest about 9½ weeks after the employment incident which is accused as being causative. The employer resists payment, contending that there does not exist substantial credible evidence establishing that the injury was the legal and medical result of the employment incident. In its Judgment the district court awarded to the employee the payment in full of reasonable medical expenses, temporary total disability, and reasonable attorney's fees. The employer has appealed from this judgment which is premised upon the existence of coverage of the injury under the Worker's Compensation Act. We will affirm the district court.

Our disposition of this case is made in accordance with well-established and recently reiterated legal standards applicable to cases under the Worker's Compensation Act. The burden of proof in the district court is upon the claimant to establish the elements of his claim and his entitlement to an award by the preponderance of the evidence,[1] and that burden is in no way

"(a) The burden of proof in contested cases involving injuries which occur over a substantial period of time is on the employee to make proper proof of his claim by a preponderance of the evidence, and to also prove by competent medical authority that his claim arose out of and in the course of his employment, by showing by a preponderance of evidence that:
"(i) There is a direct causal connection between the condition or circumstances under which the work is performed and the injury;
"(ii) The injury can be seen to have followed as a natural incident of the work as a result of the employment;
"(iii) The injury can fairly be traced to the employment as a proximate cause;

eased by the rule of liberal construction applicable to the Worker's Compensation Act. The district court having found the evidence sufficient to sustain that burden, however, the claimant is entitled to a contrary presumption on appeal, and this court will not disturb the determination of the district court if it is supported by substantial evidence. When the evidence, as in this instance, is conflicting on some issues, this court will not disturb the determination of the district court if it is supported by substantial evidence and will consider only that evidence favorable to the claimant, giving to it every favorable inference that reasonably and fairly may be drawn from it. *Jim's Water Service v. Eayrs*, Wyo., 590 P.2d 1346 (1979).

In accordance with these standards the material facts which were developed in this case lend support to the familiar quotation, " 'Tis strange but true; for truth is always strange,—stranger than fiction." Lord Byron, Don Juan, Canto XIV, Stanza 101 (1823).

Elmer Haynie reported to work at Amax Coal Company's Belle Ayr Mine on the evening shift on April 7, 1977. His job at that time was to drive and operate a water truck. He proceeded to a designated site to fill the water truck, and while he was waiting for it to fill he ascended the berm on the level of the mine where he was working to look over into the pit. (The berm is a wall constructed of earth around the edge of the pit or a level in the pit to prevent personnel and equipment from falling or being driven into the pit.) At that time, as a part of the mining operations, an explosive blast was detonated. No one other than Haynie was in a position to observe what occurred at the place where he was filling the water truck. Haynie testified that he was standing on the berm and observing the pit when the blast went off. His vantage point was 10 or 15 feet to the rear of the truck. He testified that he either fell backward or was thrown back-

ward, and when he came to his senses he was lying on his back in front of the water truck. He has amnesia with respect to the events occurring between the time that he was standing on the berm and when he found himself on his back in front of the water truck. He complained of a ringing in his ears, and headache, and he did seek medical treatment that same night. He testified that he had a good deal of trouble driving to the hospital, almost "like he was drunk." He was examined by a physician at the hospital who washed out his eyes and his ears, but did not identify any particular injury. Haynie did pursue some diagnostic recommendations made by that physician which resulted in a medical conclusion that he suffered from arteriosclerosis in his legs.

After April 7, 1977, other symptoms, consistent with the ultimate diagnosis of Haynie's condition, began to manifest themselves. Haynie said that he couldn't work, and that his vision wasn't as good as it had been before. He testified that he changed jobs because he thought it was dangerous for him to drive the water truck and that he was dizzy all the time. A friend and co-employee with whom Haynie had exchanged rides to work noticed a change in Haynie's attitude toward him. He testified that Haynie became indifferent toward him, and he had observed that Haynie did not care for the garden at his home as he had previously done. Their arrangement for rides changed so that he drove to work all the time because a couple of times Haynie had scared him with his driving. Haynie's wife testified that he had been healthy before April 7, 1977, and was pretty active, doing things around the house and working in the garden. After April 7, 1977, he got tired when they tried to work in the yard or garden and his wife further testified that she would take over his work and let him go lie down. If company came to visit sometimes he wouldn't even come out and visit with them. Instead he would stay in the bedroom of their mobile home, and on occasion he asked the company to leave. This

"(iv) The injury does not come from a hazard to which employees would have been equally exposed outside of the employment; and

"(v) The injury is incidental to the character of the business and not independent of the relation of employer and employee."

was to her a significant change in his behavior and she testified that he changed gradually, beginning two or three days or a week after April 7, 1977.

On June 13, 1977, Haynie experienced difficulty in traveling to Newcastle to meet his wife, who was returning from a trip on the bus. He was found wandering in a cow pasture near Newcastle after hanging up his car on a cattle guard. The sheriff took him to the hospital in Newcastle and he then was transported to the Rapid City, South Dakota, hospital by ambulance. There he was examined by a physician who specialized in the practice of neurology. This physician observed that he had a very classic right parietal lobe syndrome. He stated that Haynie manifested a marked ataxia with a tendency to even suggest there was an apraxia. The doctor explained that ataxia means incoordination which applies to gait or to the use of an arm, for example, and that an apraxia, while likewise indicating an inability to use an extremity, results from an inability to plan the movement in a coherent fashion due to a deficit in higher cortical functioning. The doctor pursued three immediate tests: an electroencephalogram, which showed an abnormal record, with significant hemispheteral asymmetry showing over the area of the right hemisphere; a brain scan, which showed on the blood-flow portion a decreased flow through the right carotid artery; and subsequently the doctor performed a right-carotid angiogram, which showed a total occlusion of the right internal carotid artery. The doctor found significance in his observation that the occlusion was at the level of the second cervical vertebra, and that it was tapered in its appearance and complete.

The doctor explained that this location is an unusual level to have an occlusion with atheromatous disease from arteriosclerosis, and that an occlusion at this level always is suspicious of another cause especially when the artery below is perfectly smooth and when the bifurcation of the carotid artery is normal in anatomy and appearance. The doctor explained further that the tapering of the occlusion suggests that there has been some type of an injury as in a sudden deceleration injury to the blood vessel. He testified that in such instance the innermost lining of the blood vessel develops a rent or tear, and the force of the blood passing through the blood vessel then slowly will extend that tear so that it will actually separate or dissect the innermost lining from the greater portion of the wall of the blood vessel. As such a rent or tear gets larger and larger it eventually will occlude the vessel. He testified that he had seen the development in cases such as this occur from a matter of days to a month or two months.

When asked whether he had formed an opinion as to what caused the occlusion in Elmer Haynie's right carotid artery, the doctor stated that he had formed such an opinion, testifying, "I think it was—I am most certain that this was a traumatic occlusion of the internal carotid artery." The doctor specified that the two things that led him to this conclusion were the history furnished by Haynie with respect to the incident at the mine on April 7, 1977, and the result of the angiogram that he performed. He testified that test furnished the evidence of the sudden deceleration which is the kind of trauma that can cause such an injury. He also said that it was significant to him that Haynie did not go into a coma in connection with the June 13, 1977, episode of disorientation. That circumstance indicated that the occlusion took a long time to develop and there was a gradual closing off of the blood supply. On cross-examination by counsel for Amax Coal Company, the doctor stated positively that the occlusion was trauma caused and that there was no question in his mind that Haynie had sustained a deceleration injury which resulted in a traumatic occlusion.

In presenting its position on appeal, Amax Coal Company urges in its arguments that:

1. There must be a reasonable basis for the findings of the trial judge and further they must be supported by substantial evidence.

2. There is not substantial evidence present in the record to support the judgment of the trial court that Haynie was injured on the job as he claimed.

3. Haynie failed to establish to a reasonable degree of medical certainty that the blast in which he allegedly was involved caused the injury of which he complains.

Haynie's arguments are premised upon the standards set forth above. He urges that the findings of fact by the trial court must stand when supported by substantial evidence and that even if the evidence is conflicting the appellate court will not interfere with the trial court's findings unless the findings clearly are erroneous or so totally against the evidence as to be manifestly wrong. Haynie argues that the evidence meets the required tests in this instance and particularly that the required standard of medical proof is met.

Having examined this record in light of the standards discussed above, we are satisfied that the testimony of Haynie, together with that of his wife and his co-employee, given the benefit of every favorable inference reasonably and fairly to be drawn from it, discloses that an event occurred while he was engaged in his employment on April 7, 1977, which was deleterious to Haynie. The explanation of what actually did happen depends in part upon the testimony of the specialist in neurology, together with the inferences which reasonably may be drawn from that testimony.

As to this aspect of the case, the position of Amax Coal Company is that other evidence in the record demonstrates that it was not physically possible for the blast from the detonation of the explosives to have had an effect upon Haynie. Other witnesses described the blast as being a good one which accomplished the desired result of loosening the coal in its formation and manifesting almost no explosive force upward. A point was made of the fact that the employees engaged in the blasting were actually closer to the explosion on a level of the mine below than that occupied by Haynie. We are not satisfied, however, that such testimony demonstrates the physical impossibility of some blast effect upon Haynie, primarily because none of these witnesses were at the same location as Haynie, and none of them testified to a conclusion as an expert that there could have been no effect upon Haynie. If Haynie's testimony is credited, as it must be, then he was either thrown from his position on the berm to the position in front of the truck by the force of the explosion or he himself moved from the one place to the other. It well may be that the trial court concluded that Haynie was not physically thrown from his position on the berm to the position in front of the truck but instead that he fell or dove to the ground after fleeing from a mining activity which other evidence demonstrates Haynie feared. It would not matter which inference of cause the trier of fact drew since either would invoke the coverage of the Worker's Compensation Act. What is significant is that there was evidence of an accident to Haynie which resulted in his seeking medical treatment immediately and ultimately resulted in a severely disabling injury. This was an injury as defined in § 27–311(n), W.S.1957, as amended, now § 27–12–102(a)(xii), W.S.1977.

So far as the medical aspect of the appellant's argument is concerned, the reliance by Amax Coal Company upon *White v. Maverick Production Co.,* 63 Wyo. 452, 182 P.2d 818 (1947), is misplaced. The physician who testified in that case was not the treating physician. Furthermore, while Amax Coal Company points to one particular answer of the neurological specialist in this instance, at which point in the record the doctor did testify that this type of injury would be consistent with the explosion which occurred on approximately April 7, the focusing of Amax Coal Company's position on this question and answer ignores much of the other significant testimony which the doctor furnished. An examination of that other testimony persuades us that in this instance the record adequately discloses a belief entertained by the treating physician which amounted to a positive opinion that was more than a statement of a mere possibility since he did not so qualify

it. *Jim's Water Service v. Eayrs,* supra. See *Rocky Mountain Trucking Company v. Taylor,* 79 Wyo. 461, 335 P.2d 448 (1959).[2]

In the light of the applicable standards, Elmer Haynie satisfied his burden under the statute of showing a direct causal connection between the condition. or circumstances under which his work was performed and the injury; the injury followed as a natural incident of the work as a result of the employment; the injury can fairly be traced to the employment as a proximate cause; the injury did not come from a hazard to which Haynie would have been equally exposed outside of the employment; and the injury was incidental to the character of the business of Amax Coal Company and not independent of the employer-employee relationship.

The judgment of the trial court is affirmed.

2. While the nature of this particular medical problem appears to be unique, several courts have dealt with similar problems of medical causation, reaching the same result as we reach here. See, e. g., *Crouch-Walker Company v. Industrial Commission,* 34 Ill.2d 338, 215 N.E.2d 441 (1966); *Tidewater Associated Oil Co. v. Ale,* 191 Okl. 414, 130 P.2d 991 (1942); *Schwabauer v. State,* 147 Neb. 620, 24 N.W.2d 431 (1946); *Ogden Iron Works v. Industrial Commission,* 102 Utah 492, 132 P.2d 376 (1942).